**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


**PERRY POOLER**                                    **CIVIL ACTION**

**VERSUS**                                          **NO. 06-0338**

**BURL CAIN, WARDEN**                               **SECTION "I"(5)**


### REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. §2254(e)(2). Accordingly, it is hereby recommended that the instant petition for habeas corpus relief be **DENIED WITH PREJUDICE.**

## PROCEDURAL HISTORY[1]

Petitioner, Perry Pooler, along with co-defendant, Simon Hutchinson, was charged, via a grand jury indictment, with four counts of first degree murder in violation of LSA-R.S. 14:30. Petitioner was tried separately from Hutchinson and was found guilty on July 29, 2001, following trial by jury, on all four counts. On August 30, 2001, the trial court sentenced petitioner to four consecutive life terms, at hard labor, without benefit of parole, probation or suspension of sentence.

On September 27, 2002, the Louisiana First Circuit Court of Appeal affirmed petitioner's convictions and sentences. State v. Pooler, 2002 KA 0136 (La. App. 1 Cir. Sept. 27, 2002) (unpublished opinion). Less than a year later, on April 4, 2003, the Louisiana Supreme Court denied petitioner's writ application. State v. Pooler, 840 So.2d 1201 (La. 2003).

Following the conclusion of his direct appeal proceedings, petitioner filed several post-conviction pleadings. His efforts in this regard culminated on November 28, 2005, when the Louisiana Supreme Court denied his writ applications. See State ex rel. Pooler v. State, 916 So.2d 130 (La. 2005); State ex rel. Pooler v. State, 916 So.2d 131 (La. 2005); State ex rel.

---

[1]A portion of the court's recitation of petitioner's procedural history is taken from the unpublished opinion of the Louisiana First Circuit Court of Appeal, State v. Pooler, 2002 KA 0136 (La. App. 1 Cir. Sept. 27, 2002).

<u>Pooler v. State</u>, 916 So.2d 141 (La. 2005).

In his original federal habeas corpus petition (rec. doc. 1), petitioner raises the following claims: 1) the trial court erred in not providing the defense with access to Lieutenant Camelo's notes after Camelo referred to those notes to refresh his recollection at trial; 2) the trial court erred in allowing information obtained as a result of co-defendant Simon Hutchinson's suppressed statement to be used against petitioner at trial without affording petitioner with an opportunity to cross-examine Hutchinson;[2] 3) the trial court erred in allowing the State to use petitioner's inculpatory statements to police against him at trial; 4) he was denied effective assistance of counsel; 5) testimony regarding the theft of Frank Prine's vehicle should not have been allowed absent a <u>Prieur</u> hearing; 6) evidence was insufficient to support a finding of guilt with regard to the murder of Ja'Corey Marshall; 7)the State withheld exculpatory evidence in violation of <u>Brady</u>; and, 8) he was unconstitutionally denied necessary funds to prepare an adequate defense. In his "Expansion of the Record" (rec. doc. 9), petitioner raises the following supplemental claim: 1) the trial court improperly granted the State's voir dire challenges for cause and improperly denied defense counsel's challenges for cause. The State, in its Response (rec. doc. 5),

---

[2]Claim 2) represents a consolidation of petitioner's claims two and three.

does not contest the timeliness of the instant action, but does claim that petitioner, with respect to some of his claims, has failed to exhaust his state court remedies as required under <u>Rose v. Lundy</u>, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982). However, the court chooses not to dismiss the allegedly unexhausted claims without prejudice to allow for their exhaustion because said claims are without merit. Under the provisions of 28 U.S.C. §2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

**<u>FACTS</u>**[3]

Captain Johnny Jones and Lieutenant Mark Camelo of the Tangipahoa Parish Sheriff's Office both testified that Perry Pooler admitted driving Simon Hutchinson to a trailer in Independence, Louisiana to buy drugs on the night of January 10, 2000. Pooler claimed that he waited in the car while Hutchinson went inside alone, but minutes later, Hutchinson waved him inside the trailer. Pooler told police that when he entered the trailer, Barbara Jean Curry and her two teenage children, Joseph and Dotoria, were bound and lying face down on the living room floor. Ms. Curry had a sock in her mouth. Pooler confessed that

---

[3]The facts are taken from the Louisiana First Circuit's unpublished opinion, <u>State v. Pooler</u>, 2002 KA 0136 (La. App. 1 Cir. Sept. 27, 2002).

he helped Hutchinson put Ms. Curry and Joseph into the trunk and Dotoria inside the car. He did not say whether they were armed or explain how Hutchinson overpowered the victims. According to Pooler's first statement to police, he then drove to a location in Ponchatoula where Hutchinson shot the victims with a pistol, then ran back to the car for a TEC 9 and shot them again. Pooler never mentioned a fire at the Curry trailer.

Sergeant Gary Baham of the Tangipahoa Parish Sheriff's Office testified that, in a separate, more detailed statement, Pooler said that he drove Hutchinson in a green hatchback to the Curry trailer to buy drugs from Cory Marshall. He said that Hutchinson went in first and, a few minutes later, motioned for defendant to come inside. According to Pooler's statement to Baham, the three victims were lying face down on the living room floor while Hutchinson was waving around a chrome gun and asking "the old girl" where the drugs and the money were. Pooler said that he found a safe in the bedroom, open and empty. He said that Ms. Curry told them that Cory took the money "to score." This time, Pooler admitted that he tied the victims with wire. Then he and Hutchinson loaded them into the car. Pooler did not respond to Baham's questions about the trailer fire.

Pooler told Baham that he drove Hutchinson and the victims to Ponchatoula, where he and Hutchinson removed Dotoria from the car and placed her face down in a wooded area. Pooler

mentioned that she could have run but did not, perhaps because she was scared or because she was "half naked." He did not respond to questions about why Dotoria had no clothes.

Pooler told Baham that they removed Ms. Curry and Joseph from the trunk and laid them next to Dotoria in the grass. Then Hutchinson, who had been scratching his head with the gun during the entire ride, suddenly began shooting. When the gun was empty, Hutchinson ran back to the car for the "big gun." He stood directly over the victims and fired at their heads. Pooler and Hutchinson then drove to Clinton, Louisiana.

Sergeant Baham testified that on the same night, he was called to a trailer fire near Independence, Louisiana. When he arrived, an officer on the scene immediately notified him that the body of a small male child was found inside the trailer. Baham soon discovered that the trailer's other residents, Barbara Jean Curry and her two older children, Joseph, age 16, and Dotoria, age 17, were missing.

State arson investigator Donald Carter testified that the fire was intentionally set, most likely by pouring a flammable liquid in the living room and kitchen areas where the most severe fire damage occurred. He found an empty gas can just outside the trailer's back door.

Ms. Sylvia Populous testified that on January 11, 2000, a hunter found three bodies in the woods near her home and asked

her to call police.  Sergeant Baham testified that officers found Ms. Curry, Joseph and Dotoria lying face down in the grass with multiple gunshot wounds to the head and upper body.  Ms. Curry's hands were bound behind her back; Joseph's feet and hands were bound together.  Dotoria was not bound but was naked from the waist down.

James G. Traylor, Jr. testified that he performed autopsies on all four victims.  Barbara Jean Curry, Joseph and Dotoria each died from multiple organ injuries as a result of gunshot wounds.  Sixteen-month-old Ja'Cory Marshall died of asphyxiation secondary to smoke inhalation and suffered second degree burns to his back and head.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a comprehensive overhaul of federal habeas corpus legislation, including 28 U.S.C. §2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law where there has been an adjudication on the merits in State court proceedings.

State court determinations of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. §2254(d)(1) and receive deference unless they were "contrary to, or involved an unreasonable application of clearly established

7

Federal law, as determined by the Supreme Court of the United

States." Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

The United States Supreme Court has advised that:

> Under the "contrary to" clause, a federal habeas corpus
> court may grant the writ if the state court arrives at a
> conclusion opposite to that reached by this Court on a question
> of law or if the state court decides a case differently than this
> Court has on a set of materially indistinguishable facts.  Under
> the "unreasonable application" clause, a federal habeas court may
> grant the writ if the state court identifies the correct
> governing legal principle from this Court's decisions but
> unreasonably applies that principle to the facts of the
> prisoner's case.

Williams v. Taylor, 529 U.S. 1056, 120 S.Ct. 1495, 1523, 146

L.Ed.2d 389 (2000); Hill, 210 F.3d at 485.  Questions of fact

found by the state court are "presumed to be correct ... and we

will give deference to the state court's decision unless it `was

based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding.'" Hill, 210

F.3d at 485, quoting 28 U.S.C. §2254(d)(2).

**ANALYSIS**

**A.  Claim 1): Lack of Access to Lieutenant Camelo's Notes**

A review of Lieutenant Mark Camelo's undisputed trial

testimony reflects that Camelo, along with Captain Johnny Jones,

interviewed petitioner on January 26, 2000, at the Tangipahoa

Parish Jail.[4]  Camelo read petitioner his Miranda rights, then

---

[4]See State rec., vol. 3 of 7, pp. 619-620.

proceeded, with petitioner's consent, to interview him.  A tape
recorder was present in the interview room but, pursuant to
petitioner's request, the interview was not recorded.  Instead,
Camelo took notes in connection with his interview of
petitioner.[5]

In response to direct examination questions regarding
his interview of petitioner, Lieutenant Camelo stated that
petitioner informed "that Simon Hutchinson had a Tech 9 and
emptied it on the victims".  When asked whether or not petitioner
"mention[ed] another gun", Camelo stated: "I don't recall."[6]
Shortly thereafter, Camelo provided the following clarification
with respect to whether one or two guns were involved in the
pertinent shootings.

Q.  And he [petitioner] said Simon Hutchinson did all
of the shooting; is that correct?

A.  That is what he said.

Q.  Using one gun, the Tech 9?

A.  A Tech 9.

Q.  He didn't mention a second gun at all?

A.  That was used, no, but there was a second gun he
said, but he just said that as far as the shooting with
the family, that Simon Hutchinson emptied a Tech 9 on
the family and he observed it, and watched.

Q.  What did he say about a second gun?

A.  That they had a second, I think it was a pistol
maybe.

Q.  Did he tell you where that pistol was, who had it,

---

[5]See State rec., vol. 3 of 7, pp. 622–623.

[6]See State rec., vol. 3 of 7, p. 626.

anything like that?

A.  Simon.

Q.  Simon had both guns?

A.  Yes.

Q.  So Simon had two guns and shot the people with the Tech 9, that is what he told you, is that right?

A.  That is what he said.[7]


On cross-examination, defense counsel questioned Camelo with regard to his initial testimony regarding the presence of a second gun, inquiring:

> Q.  Do [you] recall a few minutes ago, Mr. Wall [the prosecutor] asking you, did he [petitioner] mention another gun, and you responding to this jury, I don't recall?

In response, Camelo stated:

> A.  If I said that, I meant it where I thought Mr. Wall was asking if [petitioner] had a weapon, another weapon.  We were talking about another weapon.[8]


In order to clarify any confusion which may have arisen based upon Camelo's apparent conflicting testimony, the prosecution, on redirect examination, had Lieutenant Camelo refer to the notes he took in connection with his January 26, 2000 interview of petitioner, following which, the proceeding colloquy took place:

---

[7] See State rec., vol. 3 of 7, p. 627.

[8] See State rec., vol. 3 of 7, pp. 637-638.

Q.  Do your notes reflect whether this man [petitioner] mentioned one gun or two?

A.  Two.

Q.  He denied, correct me [if] I am wrong, he denied however that he used either gun; is that correct?

A.  He never touched either gun he said.[9]

Camelo's testimony to the effect that Simon Hutchinson, on the night of the incident, had two guns in his possession, was corroborated by Captain Johnny Jones.  Jones, who, along with Camelo, interviewed petitioner on January 26, 2000, testified:

Q.  Did he [petitioner] ever tell you whether or not he had a gun in his possession during the entirety of this transaction?

A.  No, sir, he didn't.

Q.  He didn't tell you one way or the other?

A.  He denied having a gun.

Q.  Did he tell you how many guns were available during this transaction?

A.  He said there were two used.

Q.  Did he say who used them?

A.  Simon Hutchinson.

Q.  Both of them?

A.  Yes, sir.[10]

Petitioner complains that the trial court erred in allowing Lieutenant Camelo to review his interview notes to refresh his memory at trial, but denying defense counsel's request for a copy of said notes.  Such an evidentiary ruling,

---

[9]See State rec., vol. 3 of 7, pp. 662-663.

[10]See State rec., vol. 3 of 7, p. 677.

11

however, even if in error, does not provide a basis for habeas corpus relief absent a showing that petitioner was prejudiced, suffering a denial of due process by virtue of the court's ruling.  See Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); Corpus v. Estelle, 571 F.2d 1378, 1381 (5th Cir.), cert. denied, 439 U.S. 957, 99 S.Ct. 359, 58 L.Ed.2d 350 (1978), citing Hills v. Henderson, 529 F.2d 397, 401 (5th Cir.), cert. denied, 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976).

In the instant matter, petitioner makes no showing of prejudice as a result of the trial court's allegedly erroneous evidentiary ruling.  Lieutenant Camelo referred to his notes for the limited purpose of clarifying his testimony to the effect that petitioner had informed that Simon Hutchinson had two guns in his possession during the incident at issue.  In the factually similar case of Mundy v. Henderson, 416 F.2d 432 (6th Cir. 1969), cert. denied, 397 U.S. 995, 90 S.Ct. 1135, 25 L.Ed.2d 404 (1970), a police officer, at trial, referred to investigatory notes in order to refresh his memory.  Defense counsel did not have an opportunity to examine the officer's notes.  The issue before the federal court was whether the "trial court's refusal to permit defense counsel to inspect the notes used by the prosecution witness to refresh his memory amounts to a federal constitutional error of such magnitude as to require the issuance of the writ of

habeas corpus." Id. at 433. The court resolved this issue in the negative, noting that defense counsel had cross-examined the witness in detail and that the pertinent testimony was cumulative and involved an uncontested matter, namely, the physical details of the motel where the defendants were apprehended. Id.

Similarly, in the instant matter, defense counsel cross-examined Lieutenant Camelo in detail, Camelo's testimony was cumulative to that of Captain Jones, and said testimony involved a matter, namely, whether Simon Hutchinson had one or two guns in his possession on the night at issue, which was not germane to the prosecution's case. Accordingly, the court finds that the trial court's refusal to provide defense counsel with access to the notes which Camelo used to refresh his memory at trial did not deprive petitioner of a fair trial and, therefore, does not constitute grounds for granting habeas corpus relief.

**B. Trial Court Erred in Admitting Evidence Obtained As a Result of Simon Hutchinson's Suppressed Statement**

In State v. Hutchinson, 819 So.2d 324 (La. 2002), the Louisiana Supreme Court determined that the statement obtained by sheriff deputies from petitioner's co-defendant, Simon Hutchinson, was illegally obtained. The law is well-established that evidence obtained as a result of unlawful police action is considered "fruit of the poisonous tree" and, therefore, inadmissible against the person from whom the statement was

illegally procured. <u>Wong Sun v. U.S.</u>, 371 U.S. 471, 484-485, 83
S.Ct. 407, 415-416, 9 L.Ed.2d 441 (1963). Petitioner, pursuant
to the instant petition, seeks to extend the above-described
"poisonous fruit" doctrine to co-defendants, arguing that
evidence obtained by sheriff deputies as a result of Hutchinson's
illegally-obtained statement could not be used against him.
Petitioner asserts that allowing such evidence to be used against
him, in light of the fact that he could not cross-examine
Hutchinson with respect to such evidence given the protection
afforded to Hutchinson under the Fifth Amendment, constituted a
violation of his constitutional rights. As shown below,
petitioner's argument in this regard is not supported by
applicable law.

In <u>United States v. Henderson</u>, 95 F.Supp.2d 588, 593
(S.D.W.Va. 2000), a statement provided by petitioner's co-
defendant, Stacey Seacrist, was deemed to have been illegally
obtained. As such, all of the evidence obtained as a result of
said statement was considered to be "fruit of the poisonous tree"
and could not be used against Seacrist. <u>Id.</u> at 594. Petitioner,
Mark Henderson, along with co-defendant, Bernard Brumfield,
argued that such evidence was "inadmissible against them as well
pursuant to the 'fruit of the poisonous tree' doctrine." <u>Id.</u>
The court, however, disagreed, reasoning: "The interrogation of
Seacrist that led to the [finding of the pertinent evidence] did

14

not violate the constitutional rights of Henderson or Brumfield. They therefore lack standing to use the illegal interrogation of Seacrist as a ground for challenging the [admissibility of said evidence].  Id., citing Wong Sun, 371 U.S. at 492, 83 S.Ct. at 419 (although seizure of heroin from co-defendant resulted from unlawful police action, the seizure did not invade petitioner's rights and he was therefore not entitled to object to its use at his trial); Dearinger v. Rhay, 421 F.2d 1086, 1088 (9th Cir. 1970) (petitioner did not have standing to urge that based upon illegality of co-defendant's arrest, evidence ultimately obtained as a result of said arrest could not be used against him at trial).  Accordingly, petitioner's claim for habeas corpus relief is without merit.

### C.  Court Erred in Not Suppressing Petitioner's Inculpatory Statements

On January 11, 2000, petitioner was picked up by Sergeant Terry Simmons because he was an occupant in a vehicle which had been reported stolen.  He was brought into custody, at which time it was discovered that petitioner was a parole violator.[11]  On January 14, 2000, the trial court appointed a public defender to represent petitioner in connection with the stolen vehicle charge.[12]  It was after petitioner's initial apprehension and his corresponding appointment of counsel in

---

[11]See State rec., vol. 7 of 7, pp. 2014-2032.

[12]See State v. Pooler, 2002 KA 0136 at p. 4.

connection with the stolen vehicle charge, that he became a suspect in the four murders.[13]

Once petitioner became a suspect in the murders, but before he was charged with the murders, he was transported to North Oaks Medical Center in Hammond, Louisiana, pursuant to a court order, to submit hair and saliva samples in an effort to connect him to the murders. At that time, petitioner asked Sergeant Gary Baham about the nature of the samples to be taken from him and what they might prove. After answering petitioner's questions, Sergeant Baham advised petitioner of his Miranda rights and inquired as to whether petitioner wanted to discuss the murders. In response, petitioner advised that he did not kill anyone, but that he had a sexual encounter with Dotoria

---

[13]Reginald McIntyre, Chief Public Defender for the 21st Judicial District Court, testified, in connection with petitioner's motion to suppress hearing, that he spoke with Pooler and Hutchinson and advised that the Public Defender's Office was representing them. McIntyre stated that this representation was in connection with matters unrelated to the four murders. See State rec., vol. 2 of 7, p. 264. Similarly, Thomas Frierson, an assistant public defender, testified that he advised both Pooler and Hutchinson that the public defender's office was representing them in connection with the offenses for which they had already been charged, in Pooler's case, the stolen vehicle charge. See State rec., vol. 2 of 7, pp. 271-272. However, Frierson also stated that he advised Pooler and Hutchinson that the public defender's office would be representing them in connection with the pending murder investigation and that they should not talk to police. See State rec., vol. 2 of 7, p. 272. In contrast, James Harrell, an investigator for the public defender's office, testified that he advised only Hutchinson that the public defender's office would be representing him in connection with the murders and that he was not to discuss the murders with anyone else. See State rec., vol. 2 of 7, p. 254.

Curry shortly before her murder.  Petitioner made no further
statements to Baham at that time.[14]

The following day, Sergeant Baham again advised
petitioner of his <u>Miranda</u> rights and attempted to question him.
Petitioner advised that he understood his rights, but ultimately
decided that he wanted to speak with someone from the police
department with more authority than Baham.  At that point, Baham
called upon his superiors, Lieutenant Mark Camelo and Captain
Johnny Jones.[15]

Lieutenant Camelo and Captain Jones both testified that
Camelo read to petitioner his <u>Miranda</u> rights and petitioner
acknowledged that he understood his rights.  Thereafter,
petitioner wanted to know what charges could be brought against
him and Captain Jones responded that he could not answer that
question without knowing the extent of petitioner's involvement
in the murders.  Petitioner then "explained his role in the ...
murders without asking for an attorney or indicating that he was
represented by counsel in this or any other matter."[16]

The next day, Sergeant Baham again read petitioner his
<u>Miranda</u> rights, following which, petitioner "reviewed his

_____

[14]<u>See</u> <u>State v. Pooler</u>, 2002 KA 0136 at p. 5.

[15]<u>See</u> <u>State v. Pooler</u>, 2002 KA 0136 at p. 5.

[16]<u>See</u> <u>State v. Pooler</u>, 2002 KA 0136 at pp. 5-6.

statement from the day before and provided additional details."
Again, petitioner "did not ask for an attorney or indicate that
he was already represented for any reason."[17]

The investigating officers, Sergeant Baham, Lieutenant
Camelo, and Captain Jones, acknowledged that they knew, at the
time they questioned petitioner, that he had been arrested on a
charge other than the murders that they were investigating and
that he had likely been appointed an attorney in connection with
the pending charge. However, at the time of the interviews,
petitioner had not been arrested in connection with the murders
and the court had not appointed counsel.[18]

Petitioner argues that the trial court's admission of
the above-described statements which he provided to Sergeant
Baham, Lieutenant Camelo and Captain Jones constituted a
violation of his Fifth and Sixth Amendment Rights. For the
following reasons, petitioner's argument is without merit.

## 1. Fifth Amendment

The Fifth Amendment guarantees that "[n]o person ...
shall be compelled in any criminal case to be a witness against
himself." In <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16
L.Ed.2d 694 (1966), the Court established several "prophylactic

---

[17]<u>See</u> <u>State v. Pooler</u>, 2002 KA 0136 at p. 6.

[18]<u>See</u> <u>State v. Pooler</u>, 2002 KA 0136 at p. 6.

18

rights" designed to preserve, in the context of a police interrogation, a person's Fifth Amendment protection. McNeil v. Wisconsin, 501 U.S. 171, 176, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158 (1991). One such protective measure was the right to have counsel present. Miranda, however, did not hold that those prophylactic rights, including the right to have counsel present, could not be waived. On the contrary, Miranda "recognized that statements elicited during custodial interrogation would be admissible if the prosecution could establish that the suspect 'knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.'" McNeil, 501 U.S. at 176, 111 S.Ct. at 2208 (quoting Miranda, 384 U.S. at 475, 86 S.Ct. at 1628)).

In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court "established a second layer of prophylaxis for the Miranda right to counsel: Once a suspect asserts the right, not only must the current interrogation cease, but he may not be approached for further interrogation 'until counsel has been made available to him....'" McNeil, 501 U.S. at 176-177, 111 S.Ct. at 2208 (quoting Edwards, 451 U.S. at 484-485, 101 S.Ct. at 1884-1885). "If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at

trial, even where the suspect executes a waiver and his
statements would be considered voluntary under traditional
standards." McNeil, 501 U.S. at 177, 111 S.Ct. at 2208.

Petitioner asserts that he "was ordered to give DNA
evidence and placed in an uncounseled, custodial interrogation
setting without the assistance of counsel **despite his prior
requests for the assistance of counsel**." (Rec. doc. 1,
petitioner's supporting brief, p. 28) (emphasis added).
Accordingly, petitioner argues that under Edwards, supra, "all of
his statements should have been suppressed...." (Rec. doc. 1,
petitioner's supporting brief, p. 29).

Contrary to petitioner's assertion, the Louisiana First
Circuit, in addressing the instant claim, specifically found that
"[t]he record includes no evidence that Pooler ... ever requested
an attorney for any reason."[19] A review of the testimony, along
with counsel's argument, provided in connection with petitioner's
motion to suppress substantiates the court's finding in this
regard.

First, petitioner, in connection with his motion to
suppress, offered no testimony to the effect that he had
requested counsel. Further, his counsel made no assertion to
this effect. Instead, the basis of petitioner's motion to

---

[19]See State v. Pooler, 2002 KA 0136 at p. 5.

suppress was the argument that his Sixth Amendment right to counsel had attached, in connection with the uncharged murder offenses, by virtue of his appointment of counsel in connection with the charged stolen vehicle offense.[20]  Additionally, all three of the pertinent law enforcement officials, Sergeant Baham, Lieutenant Camelo, and Captain Jones, testified that petitioner never requested counsel in connection with their interrogations of him.[21]

Under Hill, 210 F.3d at 485 (quoting 28 U.S.C. §2254(d)(2)), questions of fact found by the state court are "presumed to be correct ... and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  Based upon the above, this court concludes that the state court's finding, that petitioner never requested counsel in connection with the pertinent interrogations, was based upon a reasonable determination of the facts in light of the evidence presented in the state court proceedings.  Accordingly, the state court's finding in this regard is "presumed to be correct".  As such, petitioner's claim that his statements to Sergeant Baham, Lieutenant Camelo and

---

[20]See State rec., vol. 2 of 7, p. 428, lines 22-32 and p. 429, lines 1-5.

[21]See State rec., vol. 2 of 7, p. 293 (Baham's testimony); p. 328 (Camelo's testimony); and, p. 356 (Jones's testimony).

Captain Jones should have been suppressed because they were attained in violation of his Fifth Amendment protection against self-incrimination, is without merit.

### 2. Sixth Amendment

"The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.'" <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991). This Sixth Amendment right to counsel, however, "is offense specific." "It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, 'at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" <u>Id.</u>, (quoting <u>United States v. Gouveia</u>, 467 U.S. 180, 188, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984)) (additional quotation omitted).

Because "[t]he interrogations in question occurred several days before the State initiated criminal proceedings against [petitioner] for the ... murders", the state appellate court concluded that petitioner "was not yet under the protection of the Sixth Amendment".[22] Petitioner, however, seeks to

---

[22]<u>See</u> <u>State v. Pooler</u>, 2002 KA 0136 at p. 7.

circumvent the "offense specific" requirement, arguing that the stolen vehicle charge, for which he was under arrest at the time the interrogations took place, was factually related to the murders. As a result of this relationship between the two crimes, the Sixth Amendment protection, according to petitioner, had attached not only for the stolen vehicle offense, but also for the murder offenses. As such, the statements petitioner made to the officers with respect to the murders, without counsel present, should have been suppressed. As shown below, this argument has been specifically rejected by the Supreme Court.

In <u>Texas v. Cobb</u>, 532 U.S. 162, 168, 121 S.Ct. 1335, 1340, 149 L.Ed.2d 321 (2001), Lindsey Owings reported that a home which he shared with his wife, Margaret, and daughter, Kori Rae, had been burglarized and his wife and daughter were missing. Defendant, Raymond Levi Cobb, who lived across the street from the Owings, was questioned by police and confessed to the burglary but denied any knowledge relating to the disappearances. Cobb was subsequently indicted for the burglary, appointed counsel in connection with the burglary charge, and released on bond.

While Cobb was free on bond, police were contacted by his father who informed that Cobb had confessed to killing Margaret Owings during the course of the burglary. Shortly thereafter, Cobb was taken into custody and advised of his <u>Miranda</u> rights. Cobb waived those rights.

During police questioning, Cobb confessed to killing
both Margaret and Kori Rae Owings.  At trial, Cobb's confession
was admitted into evidence and he was convicted of the murders.
On appeal, Cobb asserted that his murder confession should have
been suppressed because it was obtained in violation of his Sixth
Amendment right to counsel.  Cobb argued that his right to
counsel had attached when counsel was appointed in the burglary
case and that police were therefore required to secure counsel's
permission before interrogating him in connection with the
murders.

The state appellate court agreed with Cobb's argument,
reversing his conviction and holding that "'once the right to
counsel attaches to the offense charged, it also attaches to any
other offense that is very closely related factually to the
offense charged.'" Cobb, 532 U.S. at 167, 121 S.Ct. at 1340
(quoting Cobb v. State, 2000 WL 275644, *3 (Tex.Crim.App. Mar.
15, 2000) (citations omitted)).  As explained by the Supreme
Court:

> Finding the capital murder charge to be 'factually
> interwoven with the burglary, the [state appellate]
> court concluded that [Cobb's] Sixth Amendment right to
> counsel had attached on the capital murder charge even
> though [Cobb] had not yet been charged with that
> offense.  Id. at *4.  The court further found that
> [Cobb] had asserted that right by accepting ...
> appointment [of counsel] in the burglary case.

Cobb, 532 U.S. at 167, 121 S.Ct. at 1340 (citation omitted).

The Supreme Court, which granted certiorari in

connection with the State's writ application seeking relief from the state court's reversal of Cobb's conviction, recognized that some lower courts "have read into <u>McNeil's</u> offense-specific definition an exception for crimes that are 'factually related' to a charged offense." <u>Cobb</u>, 532 U.S. at 168, 121 S.Ct. At 1340 (footnote omitted). The Supreme Court, however, specifically declined to extend <u>McNeil's</u> "offense specific" rule in such a manner, reasoning:

> Respondent predicts that the offense-specific rule will prove "disastrous" to suspects' constitutional rights and will "permit law enforcement officers almost complete and total license to conduct unwanted and uncounseled interrogations." Brief for Respondent 8-9. Besides offering no evidence that such a parade of horribles has occurred in those jurisdictions that have not enlarged upon <u>McNeil</u>, he fails to appreciate the significance of two critical considerations. First, there can be no doubt that a suspect must be apprised of his rights against compulsory self-incrimination and to consult with an attorney before authorities may conduct custodial interrogation. <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. at 479, 86 S.Ct. 1602; <u>Dickerson v. United States</u>, 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (quoting <u>Miranda</u> ).... Second, it is critical to recognize that the Constitution does not negate society's interest in the ability of police to talk to witnesses and suspects, even those who have been charged with other offenses.

<u>Cobb</u>, 532 U.S. at 171-172, 121 S.Ct. at 1342-1343 (footnote omitted).

The only narrow exception to the Sixth Amendment's "offense specific" requirement which the Supreme Court did recognize was one in which the two offenses at issue were deemed the same under the test enunciated in <u>Blockburger v. United States</u>, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The Court

explained:

> [W]e have recognized in other contexts that the definition of an "offense" is not necessarily limited to the four corners of a charging instrument. In [Blockburger]... , we explained that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." <u>Id.</u> at 304, 52 S.Ct. 180. We have since applied the <u>Blockburger</u> test to delineate the scope of the Fifth Amendment's Double Jeopardy Clause, which prevents multiple or successive prosecutions for the "same offence." <u>See</u>, <u>e.g.</u>, <u>Brown v. Ohio</u>, 432 U.S. 161, 164–166, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). We see no constitutional difference between the meaning of the term "offense" in the contexts of double jeopardy and of the right to counsel. Accordingly, we hold that when the Sixth Amendment right to counsel attaches, it does encompass offenses that, even if not formally charged, would be considered the same offense under the <u>Blockburger</u> test.

<u>Cobb</u>, 532 U.S. at 172–173, 121 S.Ct. at 1343.

In the instant matter, the charged stolen vehicle offense and the uncharged murder offenses are clearly not "the same offense under the <u>Blockburger</u> test." Accordingly, petitioner's Sixth Amendment right to counsel had not attached in connection with the uncharged murder offenses by virtue of the charged stolen vehicle offense.

Petitioner also argues that his Sixth Amendment right to counsel attached at the time he was transported to the hospital for DNA testing; therefore, any statements he made after that point should have been suppressed. Based upon the following, the court finds petitioner's argument to be without merit.

As noted earlier, petitioner, while he was merely a

suspect in the murders, was transported to North Oaks Medical Center, pursuant to a court order, to submit hair and saliva samples in an effort to connect him to the murders.  The critical fact, for purposes of addressing the instant argument, is that at the time petitioner was transported to the hospital no judicial proceedings, in connection with the murders, had commenced against him.  The Sixth Amendment right to counsel attaches "at or after the time that judicial proceedings have been initiated against [a person] 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " U.S. v. Bird, 287 F.3d 709, 713 (8th Cir. 2002) (quoting Brewer v. Williams, 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (additional quotation omitted)).  As the court explained:

> Indeed, after a formal accusation has been made – and a person who has previously been just a "suspect" has become an "accused" within the meaning of the Sixth Amendment – the constitutional right to the assistance of counsel is of such importance that the police may no longer employ techniques for eliciting information from an uncounseled defendant that might have been entirely proper at an earlier stage of their investigation.

Bird, 287 F.3d at 714 (citing Michigan v. Jackson, 475 U.S. 625, 632, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986)).  Thus, because petitioner was merely a "suspect", as opposed to an "accused", at the time he was transported to the hospital for DNA testing, this event does not constitute a "critical stage" in his proceedings, thereby triggering his Sixth Amendment right to counsel.  Accordingly, the admission of the statements he provided to Sergeant Baham at the hospital, along with the admission of the

statements he provided in connection with his subsequent interrogation by Lieutenant Camelo and Captain Jones, was not violative of his Sixth Amendment rights.

In support of his contention that his Sixth Amendment right to counsel attached prior to the interrogations by Baham, Camelo, and Jones, petitioner points to the testimony of Assistant Public Defender Thomas Frierson to the effect that he advised both Pooler and Hutchinson that the public defender's office was representing them in connection with the murder investigation and that they were not to speak to anyone regarding the alleged murders.[23] According to petitioner, this conversation, along with alleged conversations between Chief Public Defender Reginald McIntyre and/or Public Defender Investigator James Harrell with police officials informing that the indigent defender's office was representing petitioner in connection with the murder investigation, was sufficient to trigger his Sixth Amendment right to counsel; therefore, police were barred from initiating contact with him and the statements obtained, as a result of this unlawful contact, should have been suppressed.

The Louisiana First Circuit, on direct appeal, specifically rejected the instant claim, asserting: "In the absence of an assertion of right to counsel, the mere fact that IDB [Indigent Defender Board] was appointed to represent Pooler did not prohibit police from subsequently questioning him outside the

---

[23]See discussion supra at n.13.

28

presence of counsel." Pooler, 2002 KA 0136 at p. 8 (footnote
omitted).   The state court's finding in this regard is in
accordance with Supreme Court law.   In Patterson v. Illinois, 487
U.S. 285, 290-291, 108 S.Ct. 2389, 2394, 101 L.Ed.2d 261 (1988),
petitioner's Sixth Amendment right to counsel had attached by
virtue of the fact that he had been indicted, but petitioner chose
not to exercise his right to counsel.   In such a situation, the
Court reasoned, petitioner was in the same situation as the
"preindictment interrogatee" whose right to counsel is available
should he choose to exercise his right.   The Court explained:

> Had petitioner indicated he wanted the assistance of
> counsel, the authorities' interview with him would have
> stopped, and further questioning would have been
> forbidden (unless petitioner called for such a
> meeting).  This was our holding in Michigan v. Jackson,
> [475 U.S. 625, 629-630, 106 S.Ct. 1404, 1407-1408, 89
> L.Ed.2d 631 (1986)], which applied Edwards to the Sixth
> Amendment context.  We observe that the analysis in
> Jackson is rendered wholly unnecessary if petitioner's
> position is correct:  under petitioner's theory, the
> officers in Jackson would have been completely barred
> from approaching the accused in that case unless he
> called for them.  Our decision in Jackson, however,
> turned on the fact that the accused "ha[d] asked for
> the help of a lawyer" in dealing with the police.
> Jackson, supra, 475 U.S. at 631, 633-635, 106 S.Ct., at
> 1409-1411.
>
> At bottom, petitioner's theory cannot be squared
> with our rationale in Edwards, the case he relies on
> for support.  Edwards rested on the view that once "an
> accused ... ha[s] expressed his desire to deal with the
> police only through counsel" he should "not [be]
> subject to further interrogation by the authorities
> until counsel has been made available to him, unless
> the accused himself initiates further communication."
> Edwards, supra, 451 U.S. at 484-485, 101 S.Ct. at 1884-
> 1885; cf. also Michigan v. Mosley, 423 U.S. 96, 104, n.
> 10, 96 S.Ct. 321, 326 n. 10, 46 L.Ed.2d 313 (1975).
> Preserving the integrity of an accused's choice to
> communicate with police only through counsel is the
> essence of Edwards and its progeny-not barring an

accused from making an **initial** election as to whether
he will face the State's officers during questioning
with the aid of counsel, or go it alone.  If an accused
"knowingly and intelligently" pursues the latter
course, we see no reason why the uncounseled statements
he then makes must be excluded at his trial.

Patterson, 487 U.S. at 291, 108 S.Ct. at 2394 (emphasis

original).

     Finally, petitioner argues that even if he did not

specifically request counsel, his statement to Sergeant Baham at

the hospital "was not freely and voluntarily given"; his waiver

to have counsel present was overcome by the pressure he was

experiencing as a result of the impending court-ordered DNA

testing.  (Rec. doc. 1, petitioner's supporting brief at pp. 29

and 37).

     A waiver of one's right to counsel "is valid only when

it reflects an intentional relinquishment or abandonment of a

known right or privilege."  Patterson, 487 U.S. at 292, 108 S.Ct.

at 2395 (quotation omitted).  Stated differently, the accused

must be aware of what he is doing "so that his choice is made

with eyes open."  Id. (quotation omitted).

     In the instant situation, the interrogating officer,

Sergeant Baham, read petitioner his Miranda warnings before

questioning commenced.  Based upon Baham's action in this regard,

the court finds that petitioner's statement was not coerced, his

waiver of counsel was valid.  See Patterson, 487 U.S. at 293, 108

S.Ct. at 2395 (footnote omitted) ("[W]e are convinced that by

admonishing petitioner with the Miranda warnings, respondent has

30

met [its] burden and that petitioner's waiver of his right to counsel at the questioning was valid."). Accordingly, petitioner's argument in this regard is without merit.

### D. Ineffective Assistance of Counsel

The seminal Supreme Court decision regarding ineffective assistance of counsel is Strickland v. Washington, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), wherein the Court held that in order to prove that counsel was unconstitutionally ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the Strickland test, "it is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993), citing Strickland, 466 U.S. at 690, 104 S.Ct. at 2066. To prove prejudice under the Strickland standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.

### 1. Counsel Was Ineffective in Failing to Attain Lieutenant Camelo's Notes

Petitioner argues that counsel was ineffective due to his failure to attain a copy of the notes which Lieutenant Camelo referred to at trial. However, as noted above,[24] petitioner was not prejudiced by the fact that defense counsel did not attain a copy of Lieutenant Camelo's notes. Accordingly, petitioner's ineffectiveness claim is without merit.

### 2. Counsel Was Ineffective in Failing to Pursue Suppression Issue to the Louisiana Supreme Court

Petitioner argues that counsel was ineffective in failing to pursue, to the Louisiana Supreme Court, his claim that his inculpatory statements should have been suppressed. Petitioner asserts that he was prejudiced by counsel's alleged deficiency in this regard because the "unconstitutionally obtained statement" "allowed the state to obtain a conviction" against him. Further, petitioner contends that counsel's deficiency in this regard "resulted in the prosecution rushing to trial upon evidence connected to Hutchinson's unconstitutionally obtained statement." (Rec. doc. 1, petitioner's supporting brief at pp. 49-50). Based upon the following, the court finds petitioner's arguments to be without merit.

First, as discussed above, petitioner's inculpatory

---

[24]See discussion _supra_ at pp. 11-13.

statements were not "unconstitutionally obtained".[25]  Therefore, the fact that the issue was not brought before the state high court did not prejudice petitioner.

Second, as noted earlier,[26] the unconstitutionality of Hutchinson's statement had no bearing, in the context of petitioner's trial, on the admissibility of evidence arising from Hutchinson's statement.  Said evidence, by virtue of the Louisiana Supreme Court's determination that Hutchinson's statement was illegally obtained, was rendered inadmissible only as to Hutchinson, not as to petitioner.  Thus, petitioner suffered no prejudice by virtue of the fact that the issue regarding the alleged unconstitutionality of his statements was not brought to the Louisiana Supreme Court, thereby allowing the prosecution to "rush" his case to trial, prior to the state Supreme Court's ruling in Hutchinson's case.

**3.  Counsel Was Ineffective in Failing to Investigate Petitioner's Mental History and Seek <u>Ake</u> Funds to Hire an Expert**

Petitioner argues that counsel was ineffective in failing to procure an expert who could have offered testimony to the effect that petitioner lacked the mental capacity to "understand and knowingly and intelligently waive his fifth and

---

[25]<u>See</u> discussion <u>supra</u> at pp. 18-31.

[26]<u>See</u> discussion <u>supra</u> at pp. 13-15.

sixth amendment right to counsel." (Rec. doc. 1, petitioner's supporting brief at p. 51). In support of his argument, petitioner cites Ake v. Oklahoma, 470 U.S. 68, 71, 105 S.Ct. 1087, 1090, 84 L.Ed.2d 53 (1985), a case wherein the Court determined that the failure to properly examine the petitioner's mental status at the time he committed the offenses, via the hiring of a psychiatric expert, constituted a denial of his right to due process. However, as shown below, petitioner's reliance on Ake is misplaced given the significant difference between the pertinent facts in Ake and the pertinent facts in the instant situation.

In Ake, 470 U.S. at 71, 105 S.Ct. at 1090, the petitioner exhibited "bizarre" pre-trial behavior, was diagnosed "as a probable paranoid schizophrenic" and was ultimately deemed competent to proceed to trial only due to the fact that he "was receiving 200 milligrams of Thorazine, an antipsychotic drug, three times daily." Id. Shortly after he was determined competent to proceed to trial, petitioner sought an inquiry into his mental state, via a psychiatric examination, at the time he committed the pertinent offenses. The state trial court denied his request. The Supreme Court determined that the lack of an inquiry, via a psychiatric evaluation, as to petitioner's mental state at the time he committed the offenses constituted a denial of petitioner's right to due process. The Court, however,

limited its ruling to cases, such as the one before it, where the petitioner's mental condition is squarely at issue, i.e., to cases where the petitioner "is able to make an *ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor in his defense". <u>Ake</u>, 470 U.S. at 82-83, 105 S.Ct. at 1096.

In the instant matter, petitioner attempts to make the requisite "threshold showing" by pointing to the fact that he "was in special education school through out his school years". (Rec. doc. 1, petitioner's supporting brief at p. 51).[27] Further, petitioner states that he has Bell's Palsy which he describes as "a severe mental disease". (Rec. doc. 1, petitioner's supporting brief at p. 51).

In <u>Modden v. Johnson</u>, 2001 WL 361111, *4 (5th Cir. 2001), petitioner claimed that his counsel was ineffective for failing to request that a psychiatrist evaluate petitioner's mental status. However, as the court noted in its rejection of petitioner's claim, "[s]anity ... was not an issue at Modden's trial." "'<u>Ake</u> requires that the defendant, at a minimum, make allegations supported by a factual showing that the defendant's sanity is in fact at issue in the case.'" <u>Id.</u> (quoting <u>Volson v.</u>

---

[27]In support of his claim that he had a learning disability, petitioner points to a "Test Score Information Sheet", attached to his petition as appendix W, exhibit B, reflecting that on December 16, 2003, he was tested and received the following scores: Reading 3.6; Math 3.7; and Language 2.9.

Blackburn, 794 F.2d 173 (5th Cir. 1986)).  Further, the Modden
court explained that neither a "'bare assertion'" of insanity nor
"'evidence of mental problems'" is generally "'sufficient to make
the threshold showing required by Ake.'"  Id. (quoting Williams v.
Collins, 989 F.2d 841, 845 (5th Cir. 1993)).  In Modden, 2001 WL
at *4, the court found petitioner's evidence, "indicating that he
has an IQ of less than 58", to be insufficient for purposes of
making the required threshold showing under Ake.  Accordingly,
the court found petitioner had failed to satisfy his burden of
proof for purposes of showing that he received ineffective
assistance of counsel.

        Based upon the above, the court finds that petitioner's
evidence, i.e., his assertion that he was in special education
classes and his submitted 2003 test scores, is insufficient to
satisfy the requisite threshold showing under Ake.  Nor is the
fact that petitioner has been diagnosed as suffering from Bell's
palsy sufficient to satisfy his burden of proof.  Contrary to
petitioner's claim, Bell's palsy does not constitute a "severe
mental disease."  Rather, Bell's palsy, as described by the
National Institute of Neurological Disorders and Stroke, "is a
form of temporary facial paralysis resulting from damage or
trauma to one of the two facial nerves."  Accordingly, the court
finds petitioner was not prejudiced as a result of counsel's
alleged deficiency in failing to seek an inquiry, via an expert

evaluation, with regard to petitioner's mental status.

### 4. Counsel Was Ineffective in Failing to Investigate and Defend Against Frank Prine's Prejudicial Testimony

Petitioner complains that counsel failed in his duty to provide him with effective representation by failing to discredit Frank Prine's testimony.  Prine testified that petitioner stole his car, the same car that was later used to carry out the pertinent murders.  According to petitioner, Prine's testimony was "prejudicial" because it was the only evidence "link[ing] [him] to the car and by extension to the crime of murder."  (Rec. doc. 1, petitioner's supporting brief at p. 55).

A review of the trial transcript reflects that defense counsel did much to discredit Frank Prine and his testimony that petitioner stole his car.  Counsel's cross-examination of Prine commenced with his asking whether Prine was a "dope head".  In response, Prine admitted that he used dope.[28]  Next, counsel asked Prine about whether he had any criminal charges pending against him and Prine admitted that he had an outstanding burglary charge.[29]  Thereafter, counsel asked Prine about convictions and Prine admitted that he had a DWI conviction.[30]

---

[28]See State rec., vol. 6 of 7, pp. 1791–1792.

[29]See State rec., vol. 6 of 7, p. 1792.

[30]See State rec., vol. 6 of 7, p. 1795.

After interrogating Prine with respect to his criminal background, counsel questioned him specifically about his claim that petitioner stole his car. Under counsel's questioning, Prine admitted that he may have been under the influence of drugs, specifically, crack cocaine, on the date his car was allegedly stolen.[31] Further, Prine admitted that he lied to police when he reported his car stolen, telling police that the car was stolen in Albany, Louisiana, but testifying at trial that the car was stolen in Springfield, Louisiana.[32]

Clearly, contrary to petitioner's claim, counsel did much to malign the credibility of Frank Prine. Further, petitioner's assertion that Prine's testimony was the only evidence linking him to the murders is not true. Petitioner's statements to police officials, properly admitted at trial, provided ample evidence of petitioner's involvement in the pertinent murders. Accordingly, to the extent counsel's performance, in connection with his handling of Frank Prine's trial testimony, could be categorized as deficient, the court finds, in light of the other evidence properly admitted at trial linking petitioner to the murders, that petitioner was not prejudiced by counsel's alleged deficiency. Accordingly, the instant claim is without merit.

---

[31] See State rec., vol. 6 of 7, p. 1796.

[32] See State rec., vol. 6 of 7, pp. 1797–1799.

## 5. Counsel Was Ineffective in Failing to Seek Change of Venue

Petitioner represents that his case "was highly publicized as it was reported in several newspapers." According to petitioner, this publicity "created an air of guilt around [him] prior to his trial." (Rec. doc. 1, petitioner's supporting brief at p. 53). As a result of this "air of guilt", petitioner contends that the venue of his trial should have been changed. While petitioner admits that his counsel filed a motion for a change of venue, he contends that counsel was ineffective because he failed to "submit[] evidence to the court to carry the burden of proof required to have the motion granted." (Rec. doc. 1, petitioner's supporting memorandum at p. 53).

As noted above, in order for petitioner to carry his burden of proof, for the purpose of showing that counsel was unconstitutionally ineffective, he must show not only that counsel was deficient, but also that he was prejudiced as a result of counsel's deficiency. A review of the pertinent voir dire, reflecting the interrogation to which prospective jurors were subjected, reflects that petitioner was not prejudiced by virtue of counsel's alleged deficiency in failing to prevail on his motion for a change of venue.

In the matter at hand, given the publicity which accompanied petitioner's trial, special precautions were taken in

choosing the members of petitioner's twelve-person jury. For example, any prospective jurors who indicated that they had read or listened to news reports regarding the subject matter of the upcoming trial were individually questioned by both the prosecution and defense counsel.[33] Each juror, in connection with these individual interrogations, was specifically asked whether information ascertained from these outside sources would interfere with their ability to adjudicate the matter based solely upon the evidence submitted at trial.[34] The jurors who were deemed qualified to sit on petitioner's jury were only those who swore, under oath, that their judgment would be based solely upon the evidence submitted at trial and not upon any pre-trial publicity. Clearly, based upon this careful voir dire examination, petitioner was not prejudiced by counsel's alleged deficiency in failing to persuade the trial court to grant his motion for a change of venue.

> **6.  Counsel Failed to Ensure Defense Witnesses Appearance at Trial and Failed to Perform Adequate Investigation to Overcome State's Claim of Clerical Error**

Petitioner argues that counsel was ineffective in failing to ensure the appearance at trial of witnesses Cory

---

[33]See State rec., vol. 3 of 7, p. 830.

[34]See State rec., vol. 3 of 7, pp. 830–834, 836–838, 839–840, 841–842, 879–882.

Marshall and Robert Brewer.  According to petitioner, these witnesses failed to answer their subpoenas and defense counsel, "rather than ... asking the court to issue bench warrants and have them brought to court in chains if necessary", merely had the bailiff call for them in the hall and when there was no response, "moved on".  (Rec. doc. 1, petitioner's supporting brief at p. 60).

The failure to call particular witnesses to offer testimony at trial is not *per se* prejudicial to the point of warranting habeas relief.  See generally Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978) ("complaints of uncalled witnesses are not favored [in federal habeas review] because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative").  In Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985), the Fifth Circuit noted that for a petitioner to show prejudice under Strickland, he must show that the testimony of the witnesses would have been favorable and that the witnesses would have testified at trial. Petitioner must show a reasonable probability that the uncalled witnesses would have made a difference in the result.  Alexander, 775 F.2d at 603.  Petitioner, in this instance, has failed to show a reasonable probability that the uncalled witnesses, Cory Marshall and Robert Brewer, would have made a difference in the result.  Accordingly, he is not entitled to habeas corpus relief.

41

Petitioner next complains that counsel was ineffective in failing to perform a proper investigation to negate the evidence submitted by the State to overcome petitioner's alibi evidence. A review of the trial transcript reflects that the defense put on evidence to the effect that at the time of the pertinent murders, petitioner was in jail. Wanda Fay McCoy, an employee at the Tangipahoa Parish Jail, testified that a jail record reflected that petitioner was incarcerated in the Tangipahoa Parish Jail when the murders at issue took place.[35] However, on cross-examination, Ms. McCoy explained that it was her belief that the document reflecting that petitioner was in jail on January 9, 2000, was in error. She believed it was misdated; that he was actually in jail on February 9, 2000.[36]

Petitioner provides no specifics regarding the type of investigation defense counsel could have performed to overcome Ms. McCoy's testimony to the effect that the jail record reflecting that petitioner was in jail on January 9, 2000 was in error; that he was actually in jail on February 9, 2000. Defense counsel did attempt, via reexamination, to discredit Ms. McCoy's testimony.[37] Counsel's actions in this regard were appropriate. Petitioner's claim of ineffectiveness is without merit.

**E. Introduction of Uncharged Crime Evidence Without Proper Notification**

---

[35]<u>See</u> State rec. vol. 6 of 7, pp. 1866-1869.

[36]<u>See</u> State rec., vol. 6 of 7, pp. 1870-1872.

[37]<u>See</u> State rec., vol. 6 of 7, pp. 1872-1877.

The uncharged crime at issue was introduced via the testimony of Frank Prine who testified that petitioner stole his car, the same car which was subsequently used to facilitate the murders. Petitioner claims that he is entitled to habeas corpus relief because he was not provided with proper notification that the State planned to introduce evidence of a separate crime, his alleged stealing of Prine's car.

Under state law, as opposed to federal law, the prosecution is required to provide notification of its intent to introduce "other crime evidence". Specifically, La. C.E. art.404(B) provides, in pertinent part:

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, **provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.** [Emphasis added.]

In contrast, federal law, specifically, Federal Rule of Evidence 404(b), has no notice requirement in connection with the admission of other crime evidence. As the Supreme Court noted in Huddleston v. U.S., 485 U.S. 681, 682, 108 S.Ct. 1496, 1497, 99 L.Ed.2d 771 (1988), Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may,

43

> however, be admissible for other purposes, such as
> proof of motive, opportunity, intent, preparation,
> plan, knowledge, identity, or absence of mistake or
> accident.

A claim that a prisoner's state court proceeding was violative of state law, in this case, La. C.E. art. 404(B), is not cognizable on federal habeas review. Such review is limited to questions of constitutional dimension. See Jernigan v. Collins, 980 F.2d 292, 298 (5th Cir. 1992), cert. denied, 508 U.S. 978, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993); Castillo v. Johnson, 141 F.3d 218, 222 and 224 (5th Cir.), cert. denied, 524 U.S. 979, 119 S.Ct. 28, 141 L.Ed.2d 788 (1998). In the instant case, petitioner clearly suffered no constitutional violation. The "other crime evidence" about which petitioner complains was submitted not to show petitioner was a person of bad character, but rather, to show opportunity and/or identity. Such purposes are clearly permissible under federal law. Accordingly, the instant claim for habeas corpus relief is without merit.

## F. Insufficient Evidence

Petitioner contends that the State submitted insufficient evidence to support a guilty verdict in connection with the first degree murder of Ja'Cory Marshall, the 16-month old who died when the trailer he was in was set on fire. Petitioner argues that the State failed to submit sufficient evidence reflecting that petitioner knew Ja'Cory Marshall was in the trailer when it was set on fire. According to petitioner,

44

the State's case against him only consisted of his alleged statement that when he entered the trailer he "saw a safe in the bedroom" and, based upon that statement, the State presumed that petitioner "would have also [seen] the infant tucked away in a bed somewhere in one of the bedrooms". (Rec. doc. 1, petitioner's supporting brief at pp. 67-68). Petitioner submits that such a presumption, even if viewed in a light most favorable to the prosecution, fails to prove that he knew Ja'Cory Marshall was inside the trailer when it was set on fire. Petitioner further provides that the more logical presumption, given the fact that the perpetrators took all the other occupants out of the trailer, was that, had they know of Ja'Cory's existence, "he would have been carried off also". (Rec. doc. 1, petitioner's supporting brief at p. 68).

When conducting a post-AEDPA sufficiency of the evidence review, a federal court may grant relief only if it determines that the state court decision rested on an "unreasonable application" of clearly established Federal law, as determined by the Supreme Court, to the facts of the case. See 28 U.S.C. § 2254 (d)(1). In its analysis of petitioner's insufficiency of evidence claim, the Louisiana First Circuit Court of Appeal first set forth applicable state law which, based upon the Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307 (1979), provides:

The relevant question on appeal is whether, after
viewing the evidence in a light most favorable to the
prosecution, any rational trier of fact could have
found the essential elements of the crime and
defendant's identity as the perpetrator beyond a
reasonable doubt.  And the reviewing court must
evaluate the evidence in a light most favorable to the
State to determine whether the possible alternative
hypothesis offered by the defense was sufficiently
reasonable that a rational juror could not have found
proof of guilt beyond all reasonable doubt.

Pooler, No. 2002 KA 0136 at p. 17 (footnotes omitted).

Following the above recitation of applicable law, the

state appellate court reviewed the pertinent elements of first

degree murder:

First degree murder is the killing of a human being:

(1) When the offender has specific intent to kill or to
inflict great bodily harm and is engaged in the
perpetration or attempted perpetration of aggravated
kidnapping, second degree kidnapping, ... aggravated
arson, aggravated rape, forcible rape, aggravated
burglary, armed robbery, ... first degree robbery, or
simple robbery....

(3) When the offender has [a] specific intent to kill
or to inflict great bodily harm upon more than one
person....

(5) When the offender has the specific intent to kill
or to inflict great bodily harm upon a victim who is
under the age of twelve or sixty-five years of age or
older.

(6) When the offender has the specific intent to kill
or to inflict great bodily harm while engaged in the
... purchase, or any attempt thereof, of a controlled
dangerous substance....

Pooler, No. 2002 KA 0136 at pp. 17-18.

The Louisiana First Circuit then proceeded to examine

46

the definition of "specific criminal intent" and the associated

burden of proof, stating:

> Specific criminal intent is a state of mind that exists
> when the circumstances indicate that the offender
> actively desired the prescribed criminal consequences
> to follow his act or failure to act.  The State may
> prove intent by direct evidence, such as defendant's
> own statements, or by inference from circumstantial
> evidence such as defendant's actions or facts depicting
> the circumstances.

Pooler, No. 2002 KA 0136 at p. 18.

Thereafter, the First Circuit reasoned:

> Pooler did not admit any involvement in setting
> the trailer fire that killed Ja'Cory.  But his
> confession established by direct evidence that he was
> at the trailer on the night of the fire.  Ms. Populous
> testified that she heard gunshots around 9:15 p.m.
> Baham testified that by the time he arrived at CC's
> Trailer Park at approximately 9:30 p.m., the fire had
> already been extinguished and was only smoldering.
> Donald Carter's testimony offered direct physical
> evidence to establish that the fire was intentionally
> set.  Thus, the evidence supports the inference that
> Pooler and Hutchinson started the fire as they left the
> trailer.

> Pooler admitted that he and Hutchinson were inside
> the trailer and that he bound the three older victims.
> The State persuasively argued that in the process of
> overpowering and binding Ms. Curry and her two teenage
> children, Pooler and Hutchinson would surely have
> checked the entire trailer for other witnesses.  And
> Pooler admitted to police that he and Hutchinson were
> looking for drugs and money.  He found a safe in one of
> the trailer's bedrooms.  Either way, they would have
> seen Ja'Cory in the bedroom.  After reviewing the
> entire trial transcript, we find sufficient evidence to
> support the jury's determination that Pooler
> participated in setting fire to the trailer, knowing
> that Ja'Cory was inside.

> The defense suggested at trial that Cory Marshall,

Ja'Cory's father, murdered the Currys to collect insurance proceeds. But they presented no evidence to support this theory other than uncorroborated testimony that Cory Marshall purchased insurance policies on the victims at some point before their deaths.

And pursuing this hypothesis to its logical conclusion does not reasonably support Pooler's denial of specific intent to kill Ja'Cory. Even if Cory Marshall was involved in these murders, Pooler confessed to being present at both crime scenes. He did not allege that Mr. Marshall was present, so the only explanation of events left available to him was that Marshall paid Hutchinson and Pooler to execute his family. This scenario does not exonerate Pooler. In fact, that particular arrangement would confirm that Pooler intended to kill Ja'Cory.

A jury can properly accept the prosecution's hypothesis of guilt based on circumstantial evidence when it is consistent with the overall evidence and defendant's circumstantial theory of innocence is remote. Here, the State's theory that Pooler knew that Ja'Cory was in the trailer and that either Hutchinson or Pooler lit the fire is consistent with the overall evidence. And defendant's theory that Cory Marshall orchestrated the murders is not only remote, it does not clear Pooler of wrongdoing.

We are satisfied that the State proved, by direct and circumstantial evidence, facts sufficient to allow the jury to infer, beyond a reasonable doubt, that Pooler acted either directly or as a principal and specifically intended to kill each of his four victims.

Pooler, No. 2002 KA 0136 at pp. 20-21 (footnotes omitted).

Based upon the above, this court finds that the Louisiana First Circuit's rejection of petitioner's insufficiency of evidence claim does not represent an unreasonable application of Supreme Court law to the pertinent facts. See Hill, 210 F.3d at 485. As such, the instant claim is without merit.

**G. Suppression of Evidence**

48

Petitioner contends that the State withheld information which was allegedly exculpatory in violation of his constitutional rights. <u>Brady v. Maryland</u>, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963) and its progeny set forth the rule that "[t]he prosecution's suppression of evidence favorable to the accused violates the Due Process Clause if the evidence is material either to guilt or to punishment." <u>Kopycinski v. Scott</u>, 64 F.3d 223, 225 (5th Cir. 1995), <u>citing</u> <u>Brady v. Maryland</u>, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963). The prosecution is required to disclose to the defense both exculpatory evidence and evidence that would be useful for impeachment. <u>Brady</u>, 373 U.S. at 87, 83 S.Ct. at 1196; <u>Giglio v. United States</u>, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); <u>United States v. Bagley</u>, 473 U.S. 667, 675-76, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). Thus, to prove a constitutional violation as contemplated under <u>Brady</u>, there must be a suppression of evidence which is both favorable to the accused and material to his or her guilt or punishment.

Of the above three components, materiality is generally the most difficult to show. With that in mind, the Supreme Court has offered the following guidance. First, the Court has made clear that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the

defendant's acquittal." <u>Kyles v. Whitley</u>, 514 U.S. 419, 434, 115

S.Ct. 1555, 1565-66, 131 L.Ed.2d 490 (1995) (citation omitted).

Materiality is established "if there is a reasonable probability

that, had the evidence been disclosed to the defense, the result

of the proceeding would have been different." <u>Strickler v.</u>

<u>Greene</u>, 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286

(1999) (quotation and citation omitted).  The Court explained:

> The question is not whether the defendant would more
> likely than not have received a different verdict with
> the evidence, but whether in its absence he received a
> fair trial, understood as a trial resulting in a
> verdict worthy of confidence. A 'reasonable
> probability' of a different result is accordingly shown
> when the government's evidentiary suppression
> undermines confidence in the outcome of the trial.

<u>Kyles</u>, 514 U.S. at 434, 115 S.Ct. at 1566 (quotation omitted).

In support of his <u>Brady</u> claim, petitioner lists

numerous individuals whose reports and/or statements were

allegedly withheld.  (Rec. doc. 1, petitioner's supporting brief

at p. 72).  Petitioner, however, fails to explain how this

information was favorable and/or material.  Accordingly,

petitioner has clearly failed to satisfy his burden of proof with

regard to these allegedly withheld reports and/or statements.

Petitioner also claims that the State withheld

statements regarding two trial witnesses, Robert Allen and Frank

Prine.  According to petitioner, the State withheld an

investigative report reflecting that Robert Allen had seen Simon

Hutchinson driving a green Toyota Celica (Frank Prine's car) on

50

January 8, 2000, yet Prine testified that petitioner did not steal his car until January 9, 2000.  A review of the trial transcript, however, reflects that this alleged conflict between Allen and Prine regarding when petitioner and co-defendant Hutchinson came into possession of Prine's car was brought out during trial.  On cross-examination, Allen stated that he saw Hutchinson driving the green Toyota Celica during the day on either January 8th or 9th, 2000.[38]  If it was, in fact, January 8th, or even early in the day on January 9th, Allen acknowledged, pursuant to defense counsel's cross-examination, that his testimony was in conflict with Prine's version of events.[39] Accordingly, to the extent a report reflecting this discrepancy between the two witnesses' testimony was, in fact, not provided to petitioner, said report cannot be categorized as material since the discrepancy was brought to the jury's attention via defense counsel's cross examination.

Petitioner also complains that the State "withheld information in its possession impeaching both witness's [sic]", i.e., Allen and Prine, and showing that "both men have undergone physiatric [sic] and rehabilitation treatment".  (Rec. doc. 1, petitioner's supporting brief at pp. 72 and 73).  However, a review of the trial transcript reflects that defense counsel, via

---

[38]See State rec., vol. 7 of 7, p. 1997.

[39]See State rec., vol. 7 of 7, p. 1998.  Prine testified that Pooler stole his green Toyota Celica sometime "before dark" on January 9, 2000.  See State rec., vol. 6 of 7, p. 1789.

cross-examination, did much to malign the credibility of both witnesses. Allen, on cross-examination, admitted that he had a DWI conviction and admitted that he had used cocaine and had smoked crack cocaine on January 10, 2000, the date on which he reported that petitioner stole his car.[40] Similarly, as noted earlier, defense counsel, on cross-examination, thoroughly discredited Prine, getting Prine's admission that he had a burglary charge pending against him, that he had a DWI conviction, and that he was a drug user.[41] Accordingly, the court finds that petitioner has failed to show the requisite materiality of the allegedly suppressed information regarding Allen and Prine.

Finally, petitioner complains that the State withheld reports reflecting that Hutchinson had been seen driving both Prine's car and Allen's car and withheld evidence reflecting that Prine regularly rented out his car in exchange for crack cocaine. (Rec. doc. 1, petitioner's supporting brief at pp. 72-73). However, petitioner offers no explanation as to how information that Hutchinson was seen driving both cars and that Prine rented his car to Pooler, rather than Pooler taking the car, absolves him of the four murders for which he was convicted. Petitioner has failed to show not only that the allegedly suppressed evidence was material, but also, that it was necessarily

---

[40]See State rec., vol. 7 of 7, p. 2002.

[41]See discussion supra at pp. 38-39.

favorable.  Accordingly, petitioner's <u>Brady</u> claim is without merit.

### H. Unconstitutionally Denied <u>Ake</u> Funds to Prepare Adequate Defense

Petitioner claims that he was unconstitutionally denied funding for the purpose of preparing an adequate defense. According to petitioner, he should have been provided with funds to enable him to procure the following:  1) a psychiatrist or psychologist to offer testimony regarding his mental status; 2) an investigator to offer testimony regarding findings that Frank Prine's car was not stolen; 3) an investigator to offer testimony regarding the discovery of witnesses who saw "Hutchinson and Weary", not Pooler, "stealing the two car's [sic] on the 9th and 10th of January"; 4) an arson expert who "would have assisted the defense in ... the presentation of evidence as to the cause of the fire, and wether [sic] or not the fire was started in one or two places as claimed by the state's expert". (Rec. doc. 1, petitioner's supporting brief at p. 75).

As noted earlier, allegations of what an uncalled witness would or would not have testified to at trial are not favored in federal habeas review since such allegations are largely speculative.  <u>See</u> <u>generally</u> <u>Buckelew</u>, 575 F.2d at 521. In the instant matter, petitioner not only seeks to have this court speculate as to what uncalled witnesses would have testified to, but also, as to what results their investigations or evaluations would have uncovered.  Such allegations are

clearly insufficient for the purpose of showing that petitioner,
by virtue of not having his proposed investigations/evaluations
performed, suffered a violation of his right to due process.

**I. Trial Court Improperly Granted State's Challenges for Cause and Improperly Denied Petitioner's Challenges for Cause**

Petitioner complains that the trial court erred in
granting "two challenges for cause by the State simply because
these jurors expressed some concern about imposing a death
sentence, while denying the defense's challenges for cause [with
respect] to jurors who indicated that death was the only option".
(Rec. doc. 9, petitioner's expansion of the record at p. 2).
Specifically, petitioner complains that the trial court
improperly granted the State's challenges for cause with respect
to prospective jurors Johnny R. Vincent and Elizabeth Lipscomb,
and wrongfully denied defense counsel's challenges for cause with
respect to prospective jurors Minda Raybourn, Michelle Hughes,
Robert Turner, Lawrence Toups, and Georgia Aden.

Petitioner raised the instant issue in connection with
his direct appeal. In addressing the matter, the Louisiana First
Circuit acknowledged that the "proper standard", as enunciated in
Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83
L.Ed.2d 841 (1985), "for determining when a prospective juror may
be excluded for cause because of his views on capital punishment
is whether those views would 'prevent or substantially impair the
performance of his duties as a juror in accordance with his

instructions and [his] oath.'" <u>Pooler</u>, 2002 KA 0136 at p. 9

(quoting <u>Wainwright</u>, <u>supra</u>).  Thereafter, the state appellate

court, with the above law in mind, proceeded to review the

applicable facts regarding each of the prospective jurors at

issue.

<u>Johnny R. Vincent</u>

During voir dire, Mr. Vincent said that he would
only vote to impose the death penalty if the State
proved that Pooler had a history of killing and would
pose a future threat to society.  He went on to say
that he believed in the value of human life and that a
defendant should not be sentenced to death simply
because "they deserve it."

When defense counsel attempted to rehabilitate
him, Mr. Vincent said that he would "at least consider"
the death penalty if instructed by the judge to do so.
But he continued to state his reluctance to invoke
capital punishment:

A.  The death penalty I don't see as being
something that should be imposed as from a
feeling of punishment.  I feel it should be
given only if it is needed to protect the
people.  I don't know that we have the right
to impose the death penalty strictly for
punishment sake.

Q.  This is what I'm asking you.  Are you
telling us that your belief is that the death
penalty should be held out for those most
extreme cases, or are you telling us that
under no circumstances could you vote [for]
the death penalty?

A.  I could vote [for the] death penalty if I
knew the person was going to do it again.  I
could vote [for the] death penalty if I knew
the person had always been violent, had never
followed the rules before they had killed,
even in childhood.  I could vote death if I
knew a person could influence others to kill
and would influence others to kill.

Despite his assertions to the contrary, Mr.
Vincent was not willing to follow the law.  The trial
judge did not err in granting the State's challenge for
cause.

<u>Elizabeth Lipscomb</u>

During voir dire, Ms. Lipscomb repeatedly expressed ambivalence about whether she could vote to impose the death penalty, but insisted that she might be able to consider it.  After reviewing all of Ms. Lipscomb's responses, most of which were simply "I don't know," we cannot say that the trial court abused its discretion in granting the State's challenge for cause.

Regardless, even if we concluded that these two prospective jurors were improperly excused, the jury did not ultimately recommend capital punishment for this defendant.  So Pooler has no valid complaint regarding their exclusion.

When a defendant exhausted his peremptory challenges and on appeal establishes that the trial court erroneously denied a defense challenge for cause, prejudice is presumed and constitutes reversible error.  Thus, we must now consider Pooler's complaint that the trial court improperly denied his challenges for cause to Minda Raybourn, Michelle Hughes, Robert Turner, Lawrence Toups, and Georgia Aden.

## Minda Raybourn

Ms. Raybourn admitted in voir dire that she heard the initial media reports and even discussed this crime with her family.  But she said that nothing she heard led her to form an opinion on Pooler's innocence or guilt and insisted that she would find Pooler not guilty if the State failed to prove its case.  In response to defense questioning, Ms. Raybourn said that she could put aside any prior knowledge about the crimes and decide Pooler's guilt or innocence based only on what she heard in court.  She agreed to follow the judge's instructions.  After reviewing all of Ms. Raybourn's responses, we are satisfied that the trial court did not err in refusing to excuse this juror for cause.

## Michelle Hughes

Ms. Hughes consistently stated that she would vote for either death or a life sentence based on the evidence presented:

> Q.  If you had been on this jury and you had participated in the decision about whether he's guilty or not, and you had said, I'm convinced beyond a reasonable doubt that he is guilty of four counts of first degree murder, at that point is the death penalty an automatic thing for you, or would you be willing to listen to all the evidence at the penalty phase before you made a decision?

A.  I would have to listen to all of the
evidence before I made my final decision.

Q.  And whatever you thought in your own mind
and your heart was the appropriate penalty,
that's what you would vote for, whether it
would be death or life imprisonment.

A.  Yes....

Q.  Let me ask you this.  If this man were
found guilty of first degree murder, would
you automatically vote [for] the death
penalty?

A.  I would have to hear all the evidence and
then weigh the pros and cons and make my
decision.

We find no error in the trial court's decision to
deny defendant's challenge for cause to Ms. Hughes.

Robert Turner

Pooler contends that the trial court erred in
denying the challenge for cause to Mr. Turner, who
admitted that he might hear something so awful that he
could no longer consider life imprisonment as a
possible sentence.  But because the court granted a
subsequent challenge for cause based on Mr. Turner's
later answers, the first denial did not prejudice
Pooler's rights in any way.

Lawrence Toups

Pooler argues that Mr. Toups was predisposed to
vote for capital punishment:

Q.  Before you made your decision about what
penalty was appropriate, would you listen to
and give consideration to all the evidence?

A.  Yes, sir.

Q.  And if Perry Pooler or his lawyers
decided to present evidence of mitigating
circumstances[,] could you listen to that
evidence and give it consideration before you
made your choice?

A.  I could give it some consideration, but I
also feel that in a crime this heinous with
four victims that I don't feel that there's a
whole lot that could be offered up that
could, as far as mitigating circumstances,
that could make me feel that he had a minor
role in it.

Q.  I understand that.

A.  And I just, I mean, I don't know a lot

57

about the case, but I did read the papers and I have heard about the case.

Q. We are going to get into that later. Let me just ask you this. It would be fair to say that if you found this man guilty of killing four people intentionally or participating in it, you're going to be a pretty hard sell to come up with a reason to give him a life sentence?

A. Yes, sir, because of the fact that there's four victims.

Q. Exactly.

A. I didn't see any way that someone could be – like the convenience store example you gave earlier, where there's one thing and it happens quickly, maybe somebody could be off guard. But for something to happen four times in different locations, I just can't see it.

Q. That would make a difference to you, wouldn't it?

A. It makes a huge difference. And I'm not trying to prejudge and I have not prejudged, but I'm just saying if it did come to that point, I don't see how I could consider much other than the death penalty.

Q. And if the mitigating circumstance that was being presented to you was that he was a minor participant in this, the fact, as you said, of four people dead, two different locations miles apart, would make a difference to you?

A. Yes, sir. Whether I would believe that.

Q. So they might fail in that?

A. Yes.

Q. You would consider – would you consider any evidence they presented –

A. Yes. I mean, I would listen to it. I mean, I don't really want to be here to judge anybody, but I do feel that it is all of our civic duties to do this to try to keep this country safe. And I think that's why I said it's the strongest deterrent because if people aren't afraid to be punished for what they're going to do, then this will continue to happen.

Mr. Toups plainly said that he would consider mitigating circumstances before voting to impose the death penalty. He candidly admitted that he would question what could serve as an adequate mitigation if the State proved that Pooler participated in four murders in two different locations. But Mr. Toups' frank responses do not mandate his dismissal for cause. In accordance with LSA-C.Cr.P. art. 905.4(A)(4), an offender knowingly creating a risk of death or great bodily harm to more than one person is an aggravating factor appropriately considered during the penalty phase. A juror can properly accord great weight to that factor as long as he does not decide before hearing all the evidence what penalty to impose.

Mr. Toups indicated that he had not prejudged Pooler. He never said that he would automatically vote to impose the death penalty merely because the jury found Pooler guilty. He merely expressed doubt about what circumstances might be sufficient to mitigate the aggravating factors that had already been discussed at length with prospective jurors. Considering [the] trial court's vast discretion and his [sic] opportunity to see and hear Mr. Toups' responses, we are unable to conclude that it committed reversible error in refusing to exclude Lawrence Toups for cause.


Georgia Aden

Pooler argues that Ms. Aden should have been dismissed because of her prior knowledge of the Curry murders. Specifically, Ms. Aden admitted that because of what she had seen and heard in the media, even if the State introduced no evidence of the trailer fire, she would not be able to put aside her knowledge that an infant died in the fire. The State responded that the hypothetical scenario posed to Ms. Aden was defective: the State had already told prospective jurors during voir dire that there was a trailer fire and that a child died in that fire.

When the State resumed questioning in an attempt to rehabilitate Ms. Aden, she again said that she would base a verdict only on the evidence presented in court. She conceded that despite what she knew about this case, if the State presented no evidence to support a guilty verdict, she would find Pooler not guilty:

> Q. Do you understand that you can't use what you've heard or read to fill in the gaps? If there's a gap there and it wasn't said in this courtroom, you can't use what you've read or heard about the case to fill it in

and complete the scenario.

A.  I understand that what I hear in here would be what I would have to base my decisions on.

Q.  And my question is, if there is a gap, will you leave that gap open and not fill it with what you've heard out –

A.  Yes, sir, I would leave it open.

Q.  And if leaving it open meant that the man was not guilty, it would have to be not guilty; is that right?

A.  That's right.

We find that Ms. Aden's answers, taken as a whole, indicate that she could presume Pooler's innocence and decide the case solely on the evidence presented at trial.  The trial court's refusal to excuse a prospective juror on the ground that she is not impartial is not an abuse of discretion where, after further inquiry or instruction, she has demonstrated a willingness and ability to decide the case according to the law and the evidence.  We find no error in the trial court's denial of this challenge for cause.

Pooler, 2002 KA 0136 at pp. 9–14.

This court finds that the state appellate court's analysis does not represent an unreasonable application of Wainwright, supra, to the facts of this case.  Accordingly, petitioner's claim for habeas relief is without merit.

### RECOMMENDATION

It is hereby RECOMMENDED that the petition of Perry Pooler for habeas corpus relief be DENIED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon

grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this __4th__ day of _____August_____, 2009.

ALMA L. CHASEZ
United States Magistrate Judge